(C. D. 1778)

The Durst Mfg. Co., Inc. *v.* United States

United States Customs Court, Second Division

(Decided May 3, 1956)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Alfred A. Taylor. Jr.*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiff imported a so-called ball cock assembly (minus certain two parts referred to, *infra*), which the collector of customs classified as an article in chief value of metal and imposed duty thereon at the rate of 22½ per centum ad valorem pursuant to the provisions of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

It is claimed by the importer that the ball cock assembly in controversy should be classified as a machine, or part of a machine, in paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and subjected to duty at the rate of 13¾ per centum ad valorem.

At the trial, a sample illustrating the importation was received in evidence as exhibit 1.

The sole witness in the case was Norman Redlich, vice president and sales manager of the plaintiff company. He testified that his concern manufactures and imports plumbing supplies and that he is personally familiar with the nature, character, and use of the imported product.

Redlich stated that exhibit 1 is a ball cock assembly and various parts of it were identified by the witness as follows: The U-shaped piece, marked "C," is the ball cock lever assembly; the part marked "B," a ball cock plunger, being the vertical piece stretching from the lever assembly into the main body of the ball cock; the part marked "F," a ball cock hush tube; and the part marked "A," the ball cock, minus the top assembly.

The witness also identified certain parts which were not imported with exhibit 1, namely, the part marked "E," which is a ball cock refill tube, received in evidence as exhibit 1–A. Another part, marked "D" and known as a "rod and float," is used to make a complete assembly. This part was received in evidence as exhibit 1–B.

The witness then produced a sample, illustrating a complete toilet-box mechanism, which was received in evidence as illustrative exhibit 2.

The complete assembly is a commodity which is commonly seen in bathrooms throughout the country. By pressing the handle on the outside of the assembly, a series of levers on the interior of the assembly are set in motion and, through the forces of gravity and suction, water is released to flush the toilet bowl; and, by appropriate action of levers and valves and by flotation of a metal ball, the assembly is refilled for subsequent use.

For a more detailed description of the operation of the complete assembly, we quote the testimony of the witness Redlich:

When this complete mechanism is ready for use the float is in an approximately horizontal position resting on the water, which, of course, is not in the tank at the present time. That aspect of the mechanism has to be visualized. I will first, in describing how the mechanism operates, describe the means with which the water flushes from the toilet tank into the toilet bowl below. The first step in the operation is the moving of the tank lever, the front of which is on the other side of the toilet box. When the operator of the toilet box presses down on the tank lever * * *

\* \* \* \* \* \* \*

Energy is transmitted across the lever down through this rod, through a second rod, and to the rubber tank ball which rests on an item called a flush valve. When this tank lever is moved in this direction you will note that the rubber tank ball is raised. The tank ball, being made of rubber and being lighter than water, attempts to float toward the surface. It can only reach this position, being stopped by a piece of metal called an adjustable guide, the technical name for it. When this occurs the water which has been in the tank rushes through this small opening, an approximate two-inch opening, into the bowl below. All the time that the water is rushing down the rubber tank ball is making every effort to float to the top of the surface and reaches this point. As soon as the water reaches the approximate level of the rubber tank ball the ball, being made of rubber, starts to lower itself with the level of the water. When it reaches approximately this position——

\* \* . \* \* \* \* \*

Approximately one-half inch from the flush valve, the suction which is created by the hollowness of this ball forces the ball into a set position this way and stops the flow of water from the toilet tank into the toilet bowl. That is the means by which the water is flushed from the toilet tank into the toilet bowl. We now have to back up our description a bit in order to describe the means by which water is transmitted from the main water system of the home or wherever this is used into the toilet tank for its next use. You will recall I stated that at the start of the operation of this mechanism the copper float and rod was approximately in this position floating on the water.

\* \* \* \* \* \* \*

Approximately horizontal, floating on the water. As the water flushes through the flush valve in accordance with the description that I gave a few moments ago the copper float starts to lower with the level of the water which is rushing down through the tank. At this point the energy which is caused by the flotation is transmitted again across this float rod through the lever assembly, down through this ball cock plunger, which is this vertical piece, and causes the ball

cock plunger to rise. This is done by a system of double levers. One lever is the lever caused by the float rod and the copper float, the second lever is the lever caused by the lever assembly. So that as this lowers the operation of the two levers causes the ball cock plunger to rise.

Further, the witness testified:

As I stated, as the float is lowering the ball cock plunger is rising. Now, as that ball cock plunger rises water rushes up through the main water-pressure system of the home through this riser tube into the ball cock assembly, which is the imported item. And because this ball cock plunger has raised as a result of the lowering of the float the water rushes into the toilet box by means of this hush tube. So that the flow of the water is along the riser tube of the ball cock, through the point where the plunger had been rested until it was lifted as a result of the lowering of the float, down the hush tube, and into the toilet box itself. At the same time a lesser amount of water is following the same course, except that instead of following the hush tube back into the toilet box it is going up through this refill tube, through an overflow tube, back down underneath the rubber stopper, and back into the toilet bowl. The reason for that is that this flow of water raises the level in the toilet bowl so that the mechanism is ready for its next use. Observe what happens as the water rushes back into the toilet tank through the hush tube. As the water has reached its lowest level the copper float is in approximately this position, I would say three to four inches above the bottom of the toilet tank. As the water rushes in through the hush tube and starts to raise in the tank the pressure of the water raises the copper float which is floating on the top of the water. At this point the reverse happens of what happened when the water left the tank. The energy is transmitted through across the float rod, across the lever assembly again, down the ball cock plunger, only this time because the float is rising the ball cock plunger automatically starts to go down and starts to shut off this flow of water into the toilet tank. When the copper ball is approximately in a horizontal position once more the ball cock plunger has seated itself firmly in the ball cock assembly, thereby shutting off this flow of water which had been flowing through the riser tube, through the ball cock, and through the hush tube into the toilet box. At this point, after the flow of water into the toilet tank has been completely shut off, the mechanism is ready for its next use.

It is clear from the foregoing recital that when the handle on the outside of the complete assembly is depressed the internal operation of the mechanism is entirely automatic—a system of levers, valves, and rod and float, among other things, being motivated by natural forces of gravity, suction, and flotation.

In an early decision, our appellate court gave expression to a definition of a machine as being a mechanical contrivance for utilizing, applying, or modifying energy or force, or for the transmission of motion, and made reference to the Standard Dictionary, Webster's New International Dictionary, and Lockwood's Dictionary of Mechanical Engineering Terms. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537.

In later cases, the court has pointed out that it was not concerned in the *Simon* case with laying down any precise or all-inclusive definition of the term " 'machine' for tariff purposes," and, in *United States* v. *Guth Stern & Co., Inc.*, 21 C. C. P. A. (Customs) 246, T. D.

46777, quoted, with approval, the following definition of the term "machine," contained in Webster's New International Dictionary:

* * * According to the strict definition, a crowbar abutting against a fulcrum, a pair of pliers in use, or a simple pulley block with its fall, would be a machine, but ordinary usage would hardly include such as these; while an implement or tool whose parts have no relative movement, as a hammer, saw, chisel, plane, or the like, would not, of itself, in any case be a machine. Popularly and in the wider mechanical sense, a machine is a more or less complex combination of mechanical parts, as levers, cog and sprocket wheels, pulleys, shafts, and spindles, ropes, chains, and bands, cams and other turning and sliding pieces, springs, confined fluids, etc., together with the framework and fastenings supporting and connecting them, as when it is designed to operate upon material to change it in some preconceived and definite manner, to lift or transport loads, etc.

In *United States* v. *J. E. Bernard & Co., Inc.*, 30 C. C. P. A. (Customs) 213, C. A. D. 235, the merchandise before the court was described as "vertical field balances," comprising, among other things, two magnetic bars, horizontally suspended on a sensitive bearing. The poles of the magnet were horizontal, and any tilting of the magnetic system, as affected by the magnetic energy emanating from the earth, caused the magnet to deflect. The magnitude of the deflection was indicated on a scale on the instrument which could be read by geophysicists in trying to determine the character of subsurface structures having relation to deposits of minerals, especially those favorable to the accumulation of oil. In its opinion, the court commented upon what was said in the *Guth Stern* case, *supra*, and stated: "It is our opinion that a machine such as Congress had in mind must have some movable parts, and it must do some of the things pointed out in the *Simon, Buhler* case." In reaching its conclusion that the vertical field balances in the *Bernard* case were machines within the tariff sense, the court observed:

* * * The magnetic force or energy imparted to the device is utilized by the device and transmitted to other portions of the same in such a way as to bring about a desired result. The device has various movable parts and comports generally with what the lexicographers ordinarily say characterizes a machine.

Further, the court said:

* * * The machine here under consideration, by the use of a natural force, which is a power and an energy, mechanically, through the operation of a delicate bearing which permits the tipping or tilting, brings about the recording of a predetermined physical effect. This, we think, characterizes the kind of machines that Congress provided for in paragraph 372. * * *

In that case, the court was of the opinion also that there was a similarity of the articles involved in the *Bernard* case and the manner of their operation to the aneroid barometers, which were the subject of its decision in *United States* v. *L. Oppleman, Inc.*, 25 C. C. P. A. (Customs) 168, T. D. 49271. In the *Oppleman* case, it was said that whether or not articles are machines, within the purview of paragraph

372, does not depend upon the source of the force or energy which motivates them, but rather on the character and operation of the articles themselves. The aneroid barometers in that case were described as having operating movable parts, such as springs, hairsprings, levers, chains, and diaphragms, and that they were mechanical contrivances which applied energy or force.

In the case at bar, the complete assembly is composed of a rod and float, various levers, valves, and other parts motivated, as above stated, by natural forces which are utilized and applied to transmit motion.

Applying the principles laid down in the cases above cited, we find and hold that the complete assembly is a machine and that the imported ball cock assembly parts are constituent and integral parts thereof and essential to its operation. They are, therefore, parts of a machine. Consequently, it becomes unnecessary for us to determine whether or not the imported mechanism is, in itself, a machine, as alternatively claimed by plaintiff.

The following cases in support of our conclusion that the complete toilet-box mechanism is a machine are invited to our attention by plaintiff. In each instance, the subject merchandise was found to be a machine.

*United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T. D. 43135 — Sterilizing apparatus, consisting of a steam boiler, a vat, and a lead with four regulators.

*Globe Shipping Co.* v. *United States*, 60 Treas. Dec. 603, T. D. 45190 — Door checks to control automatically the closing of doors.

*Agfa Ansco Corp.* v. *United States*, 61 Treas. Dec. 205, T. D. 45432 — A gas-analyzing mechanism, operated by water power.

*C. F. Drew & Co., Inc.* v. *United States*, 63 Treas. Dec. 1564, Abstract 24293 — A distilling mechanism, consisting of tanks, boilers, pumps, etc.

*Ruths Steam Storage Co., Inc.* v. *United States*, 64 Treas. Dec. 106, T. D. 46550 — Pressure valves.

*General Aniline Works, Inc.* v. *United States*, 68 Treas. Dec. 888, T. D. 48066 — Automatic steam traps.

*H. J. Mayer & Sons Co.* v. *United States*, 3 Cust. Ct. 78, C. D. 208 — Hydraulic brine pumps.

*Bacharach Industrial Instrument Co.* v. *United States*, 8 Cust. Ct. 237, C. D. 614 — Pressure indicators.

Based upon the facts of record and following the authorities to which reference has been made, the claim of plaintiff that the subject merchandise should be classified as part of a machine, pursuant to the provisions of paragraph 372, as modified, *supra*, and dutiable at the rate of 13¾ per centum ad valorem is sustained.

Judgment will issue accordingly.