(C. D. 1990)

KEER, MAURER CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 29, 1958)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation, described on the consular invoice as "Cerini" dialysers for the depuration of caustic soda, was classified by the collector of customs as articles in chief value of metal in paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was assessed thereon at the rate of 22½ per centum ad valorem.

Plaintiff relies upon the claim in its protest that the dialysers are machines, not specially provided for, in paragraph 372 of said act (19 U. S. C. § 1001, par. 372), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T. D. 52739, and dutiable at the rate of 13¾ per centum ad valorem.

J. L. Jenkins, the only witness in the case, testified on behalf of plaintiff substantially as follows: He is vice president of the Race Chemical Equipment Corp. of Madison, Ohio, the ultimate consignee of the imported merchandise. During the past 5 years, he has been in charge of sales. The business of his company is the manufacture and sale of Cerini dialysers. His familiarity with dialysers covers a period of some 20 years, and, during the past five years, he has sold, installed, repaired, and serviced these devices.

Two photographs illustrating the dialysers in operation were received in evidence as exhibits 1–A and 1–B, respectively.

The witness explained that a dialyser is a large tank, 10 by 4 by 5 feet in dimensions, containing 50 filter diaphragms, used to reclaim caustic soda from a waste material. The diaphragms are suspended in the tank into which is fed the waste caustic material resulting from the mercerization of wood pulp in the rayon industry. The reject caustic soda is fed into the lower section of the tank through piping, the flow of the reject material being governed by the flow of diluting water which is fed to the inside of the filtering diaphragms.

The flow of water into the diaphragms is automatically controlled by a variable float valve, represented by illustrative exhibit 2. As stated by the witness, "* * * this flow of the input water governs the flow of the input reject soda. The crystalloids of the raw material, which are the very fine particles of sodium hydroxide, penetrate the surfaces of the filtering diaphragm, through the theory of osmosis, and are re-dissolved into the fresh water, fed into the inside of the diaphragm," this being a continuous flowing operation. The water float mechanism is attached to the end of the tank on the outside. "It includes the auxilliary [sic] piping, which handles the output of the dialyser, and the necessary draining material and the viscosimeter tubes."

The witness described the diaphragm as a chemically treated fabric, completely enclosed, except for the inlet and outlet sections which receive water and remove the purified caustic soda, respectively.

Specific gravity causes the sodium hydroxide crystalloids to increase in concentration when they settle to the bottom of the diaphragm and are drawn off through a viscosimeter tube at a calibrated flow, which is governed by the input of fresh water being fed into the upper areas of the diaphragm.

It seems that the colloids, which contaminate the caustic soda, are too large to penetrate the filtering diaphragm. The removal of the crystalloids causes the colloids to lose weight; they gradually flow to the upper portion of the tank, where they are drawn off through a waste line at a specified flow, which is governed by the input of fresh water to the diaphragm. The floating waste material does not flow out at the same rate of speed that the water flows in. However, it is controlled or governed by the inflow of fresh water; the fresh water, in turn, being governed by a variable float valve (exhibit 2).

By specific reference to exhibit 2, it was explained that, through force of gravity and flotation, pressure is exerted against the ball of the float valve, "* * * which is transmitted and magnified by lever action [at a ratio of 12 to 1], and eventually exerts a force against a valve mechanism, which automatically controls the input of water to the dialyser. This is done automatically from any number of pre-set levels, by adjusting the float valve." This screw mechanism on the lever portion of the float valve determines the height of the water in the head tank.

The witness stated that motion was transmitted "from the float valve through the lever to the action of the valve itself." While the variable control valve is fastened to the outside of the tank, it is directly attached to each of the 50 diaphragms within the tank, and it is essential to the operation of the dialyser.

A similar product was before this court in *Race Co.* v. *United States*, 65 Treas. Dec. 1357, Abstract 27301, which was reversed in *United States* v. *Race Co.*, 22 C. C. P. A. (Customs) 327, T. D. 47362.   In that case, however, plaintiff mainly relied upon the action of osmosis to bring the subject device within the classification of machines.   In the course of its opinion, the appellate court asserted that the dialysers in that case "constitute only receptacles in which the force of osmosis is permitted to operate.   They are no more than a tank in which a membrane is suspended, separating a body of clear water and a body of impure caustic soda in solution.   That osmosis is a force cannot be doubted, but so is gravity, and chemical affinity, and catalysis, and condensation.   Certainly, however, a tank or container in which these natural forces are permitted to operate, *without mechanical manipulation or assistance,* does not raise such a tank or container to the dignity of a machine."   [Italics supplied.]

In the case before us, however, plaintiff does not rely upon the phenomenon of osmosis to establish that a dialyser is a machine, but rather upon the fact that it has, as a necessary constituent part, a flotation valve which has movable parts and performs its functions in much the same manner as the ball cock assembly, which was part of a toilet-box mechanism, and held to be properly subject to classification as a machine.   *The Durst Mfg. Co., Inc.* v. *United States*, 36 Cust. Ct. 220, C. D. 1778.

In support of our conclusion in that case, we cited, among others, the following authorities in which various articles were held to be machines in a tariff sense:

*United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T. D. 43135— Sterilizing apparatus, consisting of a steam boiler, a vat, and a lead with four regulators.

*Globe Shipping Co.* v. *United States*, 60 Treas. Dec. 603, T. D. 45190—Door checks to control automatically the closing of doors.

*Agfa Ansco Corp.* v. *United States*, 61 Treas. Dec. 205, T. D. 45432—A gas-analyzing mechanism, operated by water power.

\*        \*        \*        \*        \*        \*        \*

*Ruths Steam Storage Co., Inc.* v. *United States*, 64 Treas. Dec. 106, T. D. 46550— Pressure valves.

\*        \*        \*        \*        \*        \*        \*

*H. J. Mayer & Sons Co.* v. *United States*, 3 Cust. Ct. 78, C. D. 208—Hydraulic brine pumps.

*Bacharach Industrial Instrument Co.* v. *United States*, 8 Cust. Ct. 237, C. D. 614—Pressure indicators.

In the *Durst* case, *supra,* we also referred to *United States* v. *J. E. Bernard & Co., Inc.*, 30 C. C. P. A. (Customs) 213, C. A. D. 235, relating to certain vertical field balances comprising, among other things, two magnetic bars horizontally suspended on a sensitive

bearing. When the poles of the magnet were tilted by the force of magnetic energy emanating from the earth, the magnitude of the deflection was indicated on a scale on the instrument which enabled geophysicists to determine the character of subsurface structures having relation to deposits of minerals, especially those favorable to the accumulation of oil.

In the course of its decision in the *Bernard* case, the court stated:

\* \* \* It is our opinion that a machine such as Congress had in mind must have some movable parts, and it must do some of the things pointed out in the *Simon, Buhler* case. [*Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537.]

The test for a machine in the *Simon* case was that it should be a mechanical contrivance which utilizes, applies, or modifies energy or force or transmits motion.

The dialysers in controversy meet the requirements of a machine in that they have movable parts, such as floats, levers, and valves, clearly illustrated by exhibit 2, and are mechanical contrivances which apply energy and force.

Based upon the record herein and upon the authorities cited, we find and hold that the subject dialysers are machines within the meaning of paragraph 372, as modified, *supra*, and are dutiable thereunder as claimed by the importer. The claim in the protest is sustained and all others are overruled.