(C.D. 2380)

Highway Cruisers v. United States

United States Customs Court, Second Division

(Decided December 26, 1962)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Before Rao, Ford, and Oliver, Judges; Ford, J., dissenting

Rao, Judge:  Plaintiff is the importer of certain refrigerator units which were assessed with duty at the rate of 22½ per centum ad valorem, pursuant to the provisions of paragraph 397 of the Tariff

1

Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, for articles, composed wholly or in chief value of base metal. It is herein contended that said merchandise is properly dutiable at the rate of 13¾ per centum ad valorem as machines, not specially provided for, within the purview of paragraph 372 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739. An alternative claim that a portion of the importation consists of articles having as an essential feature an electrical element or device, for which duty at the rate of 13¾ per centum ad valorem is provided in paragraph 353 of said act, as modified by said Torquay protocol, is virtually abandoned.

Insofar as herein applicable, the language of the respective provisions reads as follows:

Paragraph 397 and T.D. 51802, *supra:*

Articles or wares not specially provided for, whether partly or wholly manufactured:
* * * * * * *
   Composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal (not including platinum, gold, or silver), but not plated with platinum, gold, or silver, or colored with gold lacquer:
* * * * * * *
      Other (except slide fasteners and parts there)___ 22½% ad val.

Paragraph 372 and T.D. 52739, *supra:*

Machines, finished or unfinished, not specially provided for:
* * * * * * *
   Other (except * * *)_____ 13¾% ad val.
Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any article for in any item 372 in this Part:
* * * * * * *
   Other_____ The rate for the
                                                          article of
                                                          which they
                                                          are parts

The record shows that the importations in issue consist of 185 refrigeration units and various replacement parts therefor, all but 10 of which are gas operated. After importation, the units are fitted into refrigerator cabinets appropriate for use in trailers, as illustrated by plaintiff's exhibit 4.

With the aid of two diagrammatic charts (plaintiff's exhibits 1 and 3) and a photograph of the unit and its thermostatic control (plaintiff's exhibit 2), plaintiff's president and chief engineer, a qualified refrigeration engineer, identified the essential components of the subject units and described the refrigeration process which occurs within the system. As indicated by the witness, the four main parts of the involved units are A, a boiler, B, an evaporator, C, a condenser, and D, a receiver, which, regardless of whether the source of energy is gas or electricity, function as follows:

Upon receiving heat, part A then heats and generates steam from the water enclosed within the system, along with the ammonia refrigerant. Inside of part A is a coil, which upon being heated from the bottom, starts generating bubbles of steam, which carry the ammonia along with it, and starts the action going, and is known as the bubble pump to the top of the unit. Then in cooling again at the part C, or rather from part A it goes to part B, the evaporator, creating a suction on part B, then goes to part C and is cooled into the form of liquid again and flows by the gravity method down through the finned condensors [sic], then through the tube condensors [sic] to the receiver, where it again becomes liquor or gas ammonia in liquid form, then starts the cycle—that completes the cycle, which cannot be done without the generation of heat or energy by either gas or electricity.

The witness identified as moving parts of the subject devices a thermostatically controlled valve, as well as the bubbles generated in the bubble pump, by heat, which carry the liquor refrigerant through the system. The composition and function of the thermostatically controlled valve will be discussed, *infra*.

Plaintiff's evidence, as hereinabove outlined, has not been refuted, nor has any evidence been introduced by defendant, except for a letter, defendant's exhibit A, written by the witness to the customs office at Los Angeles concerning the function of the thermostatically controlled valve. As submitted for decision, the question presented is essentially one of law. In substance, the parties are seeking a determination as to whether gas-operated refrigerators are machines for tariff purposes.

It is not denied that prior decisions of this court have answered the question in the affirmative. In both *Electrolux, Inc.* v. *United States*, 52 Treas. Dec. 708, Abstract 4452, and *Camley International Co., Inc.* v. *United States*, 43 Cust. Ct. 383, Abstract 63475, it has been held that gas-operated refrigerators, functioning in substantially the same manner as the merchandise at bar, are machines within the purview of paragraph 372 of the Tariff Act of 1930, or as modified. Plaintiff invokes the doctrine of *stare decisis* in seeking the same result here.

Counsel for defendant urges, however, that the principle of the cited cases has not been approved by our appellate court. Under authority of *United States* v. *Race Co.*, 22 CCPA 327, T.D. 47362, and *United States* v. *J. E. Bernard & Co., Inc.*, 30 CCPA 213, C.A.D. 235, it is argued that before an article may be considered to be a machine for tariff purposes, it must be a mechanical contrivance, that is, it must possess some movable parts, and it is contended that neither the thermostatically controlled valve nor the moving bubbles constitute such movable parts.

A reexamination of the question involved in the *Electrolux* and *Camley* cases, *supra*, in the light of the most recent pronouncements of our appellate tribunal on the subject of what is a machine for tariff purposes, tends to support the position taken by counsel for

defendant that a machine must have some movable parts. As evidenced by the cases of *United States* v. *Idl Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756; *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786; and *Rosenblad Corp.* v. *United States*, 49 CCPA 81, C.A.D. 800, the rule of *United States* v. *J. E. Bernard & Co., supra*, is now settled law. As expressed in *Rosenblad Corp.* v. *United States, supra*, that rule states that "before an importation can be said to respond to the term 'machine,' it must be something more than a crowbar, a pair of pliers, a kitchen colander, or a box of sand for cleaning water. *Simon, Buhler & Baumann (Inc.)* v. *United States*, supra [8 Ct. Cust. Appls. 273, T.D. 37537]. The machine Congress had in mind must have some movable parts and must do some of the things pointed out in the *Simon, Buhler* case, supra. That is, it must utilize, apply, or modify force, or be used for the translation of motion."

This rule does not purport to pronounce affirmatively, for all purposes, what constitutes a machine within the contemplation of paragraph 372—"there is no 'judicial determination' of what a machine is. It remains simply a question of common meaning and each case must be decided on the basis of its own facts, technical and legislative." *United States* v. *Idl Mfg. & Sales Corp., supra*. Nevertheless, it sets forth the *sine qua non* of the qualities which must exist.

We experience no difficulty in coming to the conclusion that a system which converts the energy supplied by heat into a cooling process is one which utilizes, applies, and modifies a force. To that extent, it must be acknowledged that a gas refrigerator performs some of the things pointed out in the *Simon, Buhler* case, *supra*, and possesses some of the characteristics of a machine. However, the rule also demands that before a system may be termed a machine for tariff purposes, it must also have some movable parts.

To what has our attention been directed as constituting the movable parts of a gas refrigerator? As we have earlier observed, all of the oral evidence introduced in this case was proffered by the plaintiff. It is to be expected that its witness, a qualified refrigeration engineer, would have enumerated all the moving parts of the imported units when specific questions on that subject were addressed to him by counsel for plaintiff. His testimony reveals but two elements which he considered to be movable parts, to wit, the thermostatically controlled valve, and the steam bubbles generated in the so-called bubble pump in the boiler.

We need not dwell upon the moving fluid as a potential moving part of a gas refrigerator. The *Rosenblad* case, *supra*, is authority for holding that a flowing liquid is not a moving part. The case involved certain spiral heat exchangers, designed for the transfer of heat from a hot medium to a cold medium coursing through two concentric passages. Spiral heat exchanges were found to be "noth-

ing more than conduits in which certain natural forces are permitted to operate to the end that heat is transferred between streams of fluids flowing countercurrent in mechanically defined paths," having no movable parts, and not machines within the contemplation of paragraph 372, *supra*. A fluid which moves about in the closed circuit of refrigerator coils, whether or not bubbling, is contained within the system, but by no means can it be considered to be a moving part thereof.

There remains for consideration the structure and effect of the so-called thermostatically controlled valves. At the outset, it must be observed that no thermostats were imported with the gas-operating refrigeration units here involved, although, apparently, the importations included articles described in defendant's exhibit A as a combination filter and pressure regulator, "to compensate for altitude changes outside of the refrigerator. Due to the fact that propane and butane fuel will change pressure as temperature rise[s] and fall[s] some means of accurately controlling a constant flow is necessary."

As installed, the pressure regulator is an assembly of metal parts, consisting of a spring, a diaphragm, a shaft, and a magnet. According to the testimony of the witness, a thermocouple controlled thermostat must be incorporated in gas-operated refrigerators to protect against lack of ignition, since gas is a combustible. This is a requirement of most states in this country, but not in the country of manufacture. The witness described the control valve as follows:

This operates * * * in the burner chamber of the boiler, or item "A" as identified previously, you inject a thermocouple into the flame. Upon receiving the energy of heat, the thermocouple automatically generates a small portion of electricity. This in turn is used to control a magnet in a magnetic valve, which is fastened or put into a system ahead of the control system that is used to control the energy.

The witness further stated that, upon failure of the flame, the magnet releases the valve and "shuts it off"; that "By the control in the thermostatic action of the valve with the diaphragm pushing the shaft against the opening or base of the valve, you restrict the fuel or energy used to boil the steam, which operates the bubble pump, which in turn circulates the ammonia, which creates the refrigeration"; and that "The temperature action upon the spring causes the plunger to rise and lower against an orifice which controls the input of the energy to the flame, which also controls the boiler."

It also appears that the subject refrigeration units are equipped with knobs for manual setting and control of energy intake.

While it thus appears that much of the testimony of the witness was directed to this feature of completed gas refrigerators, it is not precisely clear from what he said whether the thermostatically controlled valve performs any direct function in the refrigeration process.

Apparently, it is inserted into gas-operated refrigerators, as the result of state law, as an automatic cutoff valve, for the reason that gas is a highly combustible element. It is not, however, a requirement in the country of manufacture, and is not attached to the refrigeration units, as imported. Presumptively, therefore, these units can produce refrigeration without the valves in question. While, under the principle of *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T.D. 41434, a device which contributes to the safe operation of a machine, and/or is required by state law, may properly be considered to be a part thereof, nevertheless, since there is no direct connection between the function of the valve and the operation of a gas refrigerator, *per se*, we do not consider valves to be movable parts of refrigerators within the requirement that a machine must have some movable parts. See and *cf. United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 CCPA 128, 132, C.A.D. 714. As we construe the rule to be applied in the determination of what constitutes a machine for tariff purposes, the movable parts to which it refers are those which directly contribute to the ultimate purpose for which the device is designed. An incidental movable feature, attached as a safety precaution, would not fall within that category.

Inasmuch as the record shows that the 10 refrigerating units which are electrically generated do not depend upon electricity for their operation, but can be converted to gas by a not too difficult modification, outside of the refrigeration circuit itself, they are obviously not articles having as an essential feature an electrical element or device within paragraph 353, as modified, *supra*.

In view of the foregoing considerations, we are constrained to depart from the prior decisions of this court concerning gas-operated refrigerators and to hold that the instant refrigeration units are not machines for tariff purposes. All claims in the instant protests are, therefore, overruled.

Judgment will be entered accordingly.

DISSENTING OPINION

FORD, Judge: I am in agreement with the majority opinion that, under the most recent pronouncements of our appellate court in *United States* v. *Idl Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756, *Nord Light, Inc.* v. *United States*, 49 CCPA 12, C.A.D. 786, and *Rosenblad Corp.* v. *United States*, 49 CCPA 81, C.A.D. 800, in order to be a machine, the mechanical contrivance must have some movable parts. I am also in agreement that the imported refrigeration unit, containing a so-called bubble pump and circulation of a fluid within a sealed unit, does not constitute a moving part under the *Rosenblad Corp.* case, *supra*.

The majority opinion cites the case of *United States* v. *Bosch Magneto Co.*, 13 Ct. Cust. Appls. 569, T.D. 41434, as standing for the

principle that where a device contributes to the safety of operation of a machine, and/or is required by state law, it may be properly considered to be a part of a machine. However, the majority opinion did not so consider the thermostatically controlled valve, which the record indicates at the time of importation was required by law in all but seven states, and, at the time of trial, in all states, but held it was an incidental movable feature which did not assist, nor was it essential, to the operation of the gas refrigerator *per se*, citing *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 CCPA 128, 132, C.A.D. 714.

Since the thermostatically controlled valves were required by law and are clearly utilized for the safety of operation of gas refrigerators, we all agree they constitute parts for tariff purposes. However, I do not consider these parts to be incidental. The record clearly establishes that the thermocouple is injected into the flame, thereby generating a small amount of electricity, which is, in turn, transmitted to an electromagnet in the magnetic valve. The record further indicates that, upon failure of the flame, the magnet releases the valve and shuts off the supply of gas. When the gas supply is shut off automatically, by virtue of this thermostatically controlled valve, it is obvious that the refrigeration unit is unable to operate, and rather than being incidental, as held by the majority, it is, in fact, essential, which is manifested by the requirements under state law.

In the case of *United States* v. *Antonio Pompeo*, 43 CCPA 9, C.A.D. 602, certain superchargers were held to be parts of automobiles since, once installed, the engine would not operate if the supercharger did not function. In the case at bar, once the thermostatically controlled valve is installed, the failure of the flame would likewise prevent the functioning of the refrigeration unit. Both the supercharger in the *Pompeo* case, *supra*, and the thermostatically controlled valve in the case at bar function while the unit is in operation. With the thermostatically controlled valve, when the flame, which is the energy utilized by the refrigerator, is functioning properly, a small amount of electricity is generated, which activates the electromagnet and keeps the valve open to permit the admission of fuel. Upon failure of the flame, the valve automatically closes, shutting off the supply of fuel, which consequently prevents the proper operation of the refrigeration unit. Therefore, I am of the opinion that the thermostatically controlled valve is a part, within the purview of the *Bosch Magneto* case, *supra*, and brings the refrigeration units involved herein within the principles of the *Pompeo* case, *supra*.

I would, therefore, hold that a gas refrigerator, requiring a thermostatically controlled valve, is a machine having a movable part, within the purview of paragraph 372, as modified, as claimed by the plaintiff herein.