(C.D. 2829)

THE GREEN FUEL ECONOMIZER CO., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided on rehearing [Abstract 67167] November 23, 1966)

*Sharretts, Paley & Carter* (*Donald W. Paley* of counsel) for the plaintiff.
*Barefoot Sanders*, Assistant Attorney General (*Richard J. Kaplan* and *Harvey A. Isaacs*, trial attorneys), for the defendant.

Before RAO and FORD, Judges, and WILSON, Senior Judge

WILSON, Judge: This case is before us on a rehearing from the decision of this court in *The Green Fuel Economizer Co., Inc.* v. *United States*, 49 Cust. Ct. 286, Abstract 67167. The protests relate to certain metal parts of a so-called low-level economizer, a device designed for use in connection with the boilers in a plant that generates electric power. The articles are described more specifically, *infra*. The merchandise was assessed with duty at the rate of 20 per centum ad valorem or 19 per centum ad valorem, depending upon the dates the goods were entered for consumption, under paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as articles, wholly or in chief value of steel, not specially provided for.

The only claim relied upon by the plaintiff herein is that the imported articles, except certain paraclone cells, covered by entry 971392 and protest 60/115, are properly classifiable under paragraph 372 of the tariff act, as modified, *supra*, as parts of machines, not specially provided for, at the rate of 12 per centum ad valorem or 11½ per centum ad valorem, depending upon the date the goods were entered. The paraclone cells are not parts of an economizer, and the protest claims as to such cells were abandoned.

At the original hearing, the plaintiff introduced the testimony of Mr. Stan Jewson who at that time was the manager of the Economizer Division of the Green Fuel Economizer Company, Beacon, N.Y., the importer of the involved merchandise and manufacturer of power generating equipment, including fuel economizers. The plaintiff at that time attempted to prove by the testimony of its witness that the imported merchandise consists of parts of a "low-level economizer" and that the entire article, the low-level economizer, is a machine within the purview of paragraph 372 of the tariff act.

At the original hearing, plaintiff introduced in evidence a brochure entitled "Green Premier Diamond Economizers," illustrating the design and construction of some of the imported "parts." (Plaintiff's collective exhibit 1, pages 6 and 7.) Plaintiff's collective exhibit 2, pages 2 and 3, consists of a pamphlet entitled "Green's Economiser Premier Diamond Type 15," illustrating the type 15 fuel economizer and some of the involved parts. Plaintiff's illustrative exhibit 3 is a brochure issued by the plaintiff which describes the low-level economizer. There was further introduced in evidence herein a diagrammatic sketch of a low-level economizer (plaintiff's exhibit 4) which plaintiff's witness stated was illustrative of a low-level economizer similar to that constructed of the imported articles (rehearing, R. 6–7).

Plaintiff's witness, Jewson, identified the imported articles specifically as tubes, bends, headers, bolts, joint rings, supports, tube plates, packers, sealing rings, and retaining rings, which he stated were illustrated in exhibits 1 and 2 (R. 6–7, original hearing). The above described articles, together with the casings which housed the economizer, certain piping valves, pumps, and pressurization chambers, which articles were manufactured in this country, were designed and combined to make a low-level heat economizer unit in a power generating station of the Dayton Power and Light Company in Dayton, Ohio (original hearing, R. 8–9). The witness described the functions of a low-level economizer as a heat exchanging device designed to recover low-grade thermoenergy from the products of combustion of power boilers and to transfer this energy to the airstream that is being fed into the boilers.

This court, in its decision heretofore rendered (Abstract 67167, page 289), stated that it was not clear from the record in that case whether certain valves and pumps mentioned are parts of the economizer in the true tariff sense of the word parts, or if said articles are essential or desirable components in connection with the overall power generating plant; and further, that said mention of a pump in plaintiff's exhibit 3 does not indicate that the pump is "part" of the low-level economizer.

Plaintiff, in its present brief on rehearing (page 3), makes the following statement:

It become obvious to Plaintiff from reading this Court's decision that the record was deficient in that it did not sufficiently distinguish an "economiser" or "fuel economiser" from a "low-level economiser." It is Plaintiff's contention that the system installed by it at the Dayton Power & Light Co. plant is a *low-level economiser* and that it contains many component parts, including pumps, valves, pipes and an economiser unit. Plaintiff claims that the low-level economiser is a "machine" in the tariff sense and that the imported merchandise is a part of that machine. [Italics quoted.]

At the present hearing, plaintiff's witness stated that there was a distinction between the company's low-level economizer and "any other thing which might be called an economiser," as follows:

Q. Would you explain the difference?—A. An economiser was first introduced some 120 years ago, and its sole purpose was to raise the temperature of feed water being fed to raise the temperature of feed water being fed for the generation of steam. The boiler would operate whether or not the economiser was installed, but without an economiser it would operate less efficiently. A low-level economiser is installed in addition to a conventional economiser. It is independent of the economiser. It is not involved with feed water. The water which passes through a low-level economiser circulates through a second heat exchanger, where the temperature of the water is reduced. It is then returned to the first heat exchanger, where additional heat is picked up, and the water is constantly in circulation and does not leave the system. [R.8.]

Plaintiff's witness described the operation of the low-level economizer substantially as follows: The products of combustion, or fuel, or oil, in the boiler leave the boiler and pass through a heat exchanger called an "air heater." Heat is recovered from this flue gas and exchanged to the airstream entering the boiler. "This is usually in the form of Ljungstrom air heater" (which admittedly is not a part of the low-level economizer) (R.10); the gas leaving the Ljungstrom air heater passes through the primary heat exchanger of the low-level economizer (R.10); the heat which is referred from flue gas in the primary heat exchanger is conveyed mechanically by pump through pipe lines to a secondary heat exchanger located in the combustion air duct (R.11); the water which has been heated leaves the primary heat exchanger and then passes through an additional heat exchanger to a second heat exchanger, where the heat which was absorbed in the primary heat exchanger is dispersed to the airstream which then passes through to the Ljungstrom heater. (R.11–12.) The water in the system which has been cooled passes through a pump and back to the primary heat exchanger. This water is constantly in circulation from

one heat exchanger to another conveying heat mechanically from one medium to another. In this case, heat is being conveyed from flue gas. Plaintiff's witness further testified herein, as follows:

Q. By this heat exchanger you mean the second heat exchanger?— A. Yes. Since it is extremely important that a prescribed air temperature is maintained entering the Ljungstrom air heater it is necessary to provide temperature controls in the low-level economiser. If the water leaving the primary heat exchanger is insufficiently high to provide the required air temperature leaving the secondary heat exchanger steam is automatically admitted to an accessory steam heater. The inlet valve controlling the steam admitted to the auxiliary steam heater is controlled by sensitive temperature problems in the air stream and the gas stream. These temperatures are average, and if the average temperature does not exceed a prescribed level the steam valve opening admitting steam to the auxiliary heat exchanger and the temperature of the water entering the secondary heat exchanger is increased to the required level. [R.12–13.]

Plaintiff's witness then stated that to prevent condensation of acid from the flue gas, the water temperature entering the economizer is kept to a predetermined level by an automatically controlled bypass valve. (R.13.) The temperature of the water returning to the economizer "is sensed and a signal is transmitted to the automatic by-pass valve." The bypass valve then opens, allowing hot water to pass from the hot side of the secondary heat exchanger to the cool side, thus maintaining the water returning to the economizer at a predetermined level. (R.13–14.) A low-level economizer, depending upon its size, would have from 3 to 9 pumps and between 50 to 100 valves. (R.14–15.)

On cross-examination, plaintiff's witness testified that the portion of plaintiff's exhibit 4 which he had outlined in blue pencil and marked with the letter "A" is referred to as a "Gas coil heat exchanger" or an "economiser heater" (R.16); that the important components are parts of that portion of the low-level economizer identified with the letter "A" in plaintiff's exhibit 4. (R. 17–18.) Plaintiff's witness further testified that the gas, which is cleaned immediately, passes through the primary heat exchanger "over tubes" (R. 19), the motivating force being two fans or blowers (R. 20) which the witness described as part of the steam generating equipment. Mr. Jewson stated that the first unit of the low-level economizer through which the gas will pass is known as "Gas coils" (letter A, plaintiff's exhibit 2)—a "Type 15 low-level economiser"—and that the heat transfer takes place from the hot air to the liquid contained in the "coil" of the primary heat exchanger, such heat transference being known as "Convection" (R. 20–22); that the liquid which is contained within the gas coils "is conveyed by differential pressure through a series of passages to the secondary heat exchanger." (R. 23.) The witness testified that the pump would be a centrifugal pump driven by an electric motor, "specially sized to give

the correct circulating rate within the low-level economiser." (R. 26.) The temperature controlled valves are activated by a piston connected "to a diagram [sic]" on which compressed air is acting, the amount of compressed air being controlled by the temperature which is being sensed. (R. 27.) He further stated that the "gas coils" is an integral part of the low-level economizer without which the latter could not function.

Plaintiff in the first instance in the case at bar, in support of the claimed classification, notes in its brief the "well settled rule of law" that an integral part of an integral part of an article is an integral part of such article, citing therein a number of cases which will be hereinafter discussed. We deem it pertinent to this juncture, to review certain holdings of this and our appellate court to which our attention has been directed by the parties herein in their respective briefs relative to the question as to what constitutes a "machine" for tariff purposes and what might properly be held to be "parts" thereof.

In *Westinghouse Air Brake Co.* v. *United States*, 26 Cust. Ct. 170, C.D. 1319, certain merchandise described as "Water Cylinder Top Head Monel Liners," designed for use as parts of feed water pumps, was classified under paragraph 397 of the Tariff Act of 1930 at the rate of 45 per centum ad valorem, as articles not specially provided for, composed of metal. It was not disputed therein that said Monel liners were in fact parts of feed water pumps, and that said pumps were parts of locomotives. The court in the *Westinghouse* case, *supra*, held that, inasmuch as an integral part of an integral part of an article is an integral part of such article (*United States* v. *American Express Co.*, 29 CCPA 87, C.A.D. 175), the liners in question were properly classifiable under paragraph 372 of the tariff act at the rate of 15 per centum ad valorem as parts of locomotives, as claimed. In so holding, the court in the *Westinghouse* case, *supra*, page 172, stated:

Another case which lends itself to this discussion is *Landay Bros.* v. *United States*, 5 Ct. Cust. Appls. 498, T.D. 35151, wherein it was held that so-called "needles" for phonographs were necessary parts of reproducers and that inasmuch as a reproducer was an integral and indispensable part of a phonograph, the "needles" were integral parts of phonographs.

See also in this connection, *United States* v. *Sheldon & Co.*, 15 Ct. Cust. Appls. 308, T.D. 42484; *United States* v. *Moore & McCormack Co.*, 15 Ct. Cust. Appls. 322, T.D. 42489.

In *C. F. Drew & Co., Inc.* v. *United States*, 63 Treas. Dec. 1564, Abstract 24293, the protest involved the proper classification of two complete distilling plants imported in a knocked-down condition. The importation comprised "various tanks, boilers, pumps, connecting pipes, and valves, complete in all the necessary parts, requiring only

to be assembled and set up so that power may be applied to start the plant in operation. The apparatus was designed and used for the distillation of fatty acids from garbage grease and other refuse of like character by the application of a vacuum produced by a vacuum pump which evacuated the whole system, the entire process being carried on at about one twenty-fourth of the normal atmospheric pressure. On the above facts, the court held the involved merchandise properly dutiable under paragraph 372 of the Tariff Act of 1930, as machines, not specially provided for as claimed. To like effect, see also *Emery Industries, Inc.* v. *United States*, 68 Treas. Dec. 39, T.D. 37789; *Gas Equipment Co.* v. *United States*, 66 Treas. Dec. 934, Abstract 28772; and *Charles Wagner* v. *United States*, 56 Treas. Dec. 733, Abstract 9231.

In the oft-quoted case of *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T.D. 37537, the court, citing lexicographic authorities, stated that an article which is not a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion, cannot properly be called a machine. Our appellate court in *United States* v. *IDL Mfg. & Sales Corp.*, 48 CCPA 17, C.A.D. 756, discussed the *Simon, Buhler* case, *supra*, and at page 23, stated:

* * * While many items have been held to be, or not to be, "machines," there is no "judicial determination" of what a machine is. It remains simply a question of common meaning and each case must be decided on the basis of its own facts, technical and legislative.

In *Nord Light, Inc.* v. *United States* (lamp cord pulleys), 49 CCPA 12, C.A.D. 786, our appellate court, in holding the involved articles properly classifiable as "machines" within the meaning of paragraph 372 of the Tariff Act of 1930, at page 15, stated:

A common meaning of the word "machine," found in the dictionaries which we referred to in the *IDL* case, supra, is a device which may be either simple or complex, whose function is to increase the intensity of an applied force, or to change its direction, or to change one form of motion or energy into another form. * * *

In the recent case of *Highway Cruisers* v. *United States*, 50 Cust. Ct. 1, C.D. 2380, the merchandise there consisted of a certain gas-operated refrigeration unit. The majority opinion in that case, page 4, stated:

We experience no difficulty in coming to the conclusion that a system which converts the energy supplied by heat into a cooling process is one which utilizes, applies, and modifies a force. * * *

The court in the *Highway Cruisers* case, *supra*, held that whereas in that case, the only moving part of such a system was a thermostatically controlled valve, installed as a safety measure to protect

against gas failure, which does not function in the refrigeration process, such a unit is not a machine within the contemplation of paragraph 372, *supra*.

As heretofore indicated, the testimony in the case at bar indicates that a number of valves are employed in the operation of the low-level economizer (R. 12–15). In certain cases involving valves, pumps, or other mechanical contrivance, our courts have held the articles there involved properly classifiable as "machines" or parts thereof. See *John Strachan Co.* v. *United States* (steam adjusticators), 67 Treas. Dec. 624, T.D. 47642; *Keer, Maurer Co.* v. *United States* (large tanks), 40 Cust. Ct. 247, C.D. 1990; *Ansonia Copper & Iron Works* v. *United States* (wine still), 2 Cust. Ct. 259, C.D. 137; *Norman G. Jensen and Waverly Sugar Company* v. *United States* (filter press plates and frames), 25 Cust. Ct. 27, C.D. 1258; and *Hoffmann-La Roche, Inc.* v. *United States* (evaporator set), 11 Cust. Ct. 82, C.D. 800.

In the prior case (Abstract 67167, *supra*), the court was of the opinion that the heat exchangers and the Ljungstrom heating device are not part of the fuel economizer and that the two separate heat exchangers are located outside the fuel economizer, in other words, that the Ljungstrom device and the two heat exchangers, although a part of the system, are not parts of the fuel economizer; and, further, that it appeared from the record that the valves (Nos. 2 and 3 on plaintiff's exhibit 3) and the pump referred to by plaintiff's witness Jewson, are also outside the fuel economizer. In the present case, plaintiff's witness on cross-examination testified as follows:

Q. I would like to direct your attention to Exhibit 1, and ask you what is depicted on Exhibit 1; what is that unit?—A. Heat exchanger tubes, very similar to the ones that are installed at Dayton, Ohio plant, together with end boxes and MS headers.

Q. Does it depict any of the pumps or valves which you were testifying about this morning?—A. No, sir, it does not. [R. 28–29.]

Plaintiff, in its brief herein, maintains that the description by its witness of the operation of the low-level economizer "showed the importance of maintaining carefully controlled temperatures and clearly indicated that the low-level economizer must utilize at least three mechanical pumps as well as numerous automatically operated temperature sensitive valves to properly perform its function." (R. 10–15.) However, the primary question remains, whether the low-level economizer is a machine and whether the imported components are parts of such a machine within the tariff definition of that term as noted in the *Nord Light* and *IDL Mfg. & Sales Corp.* cases, *supra*. Further testimony in the present record discloses the following:

Q. I direct your attention to Exhibit 2, and ask you—two pictures in Exhibit 2, and I believe you have identified one which is marked

with an "A," as gas coils. I ask you what the other picture depicts?—A. It shows a complete unit with cutaway portions.

Q. What complete unit is shown?—A. An economiser.

Q. The complete economiser is shown on page 3?—A. An economiser is shown on page 3, a complete one.

Q. Would you describe where the pump would be located?—A. This is a feed water economiser, not a low-level economiser. I should like to point that out.

Q. This is not the economiser with which we are dealing?—A. Except that the same type of tubes are used. I think the wording of the text will illustrate that this is a feed water economiser.

Q. Then depicted on page 3 is what you would describe as a feed water economiser?—A. Yes.

Q. Then that contains none of the pumps which you were describing?—A. It does not. [R. 29.]

and further:

Q. Where would the pump on a Type 15 feed water economiser be?—A. There would be a feed water pump which pumps water into the boiler.

Q. Is it illustrated on page 3 of exhibit 2?—A. No, sir, it is not part of the economiser. [R. 31.]

Plaintiff's witness testified that the number of pumps and valves would vary with the size of the economizer. (R. 14.) ; "There would be a minimum of 3 pumps and possibly 8 or 9 pumps." "There could be between 50 and 100 valves on each low-level economiser. Approximately a quarter of these would be automatically operated." (R. 15.)

Further testimony regarding a feed water economizer, as depicted on page 3 of plaintiff's exhibit 2, was given as follows:

Q. Does it contain any headers?—A. It does.

Q. Does it contain a lifting cradle?—A. It contains a lifting device for removing of the casing panels.

Q. Does it contain welding clips?—A. This illustration does not contain welding clips.

Q. Does the article illustrated on page 3 contain welding clips?—A. No.

Q. Are you familiar with such an article as contained on page 3 of Exhibit 2?—A. Yes, sir.

Q. And that is a feed water economiser?—A. Yes, it is.

Q. That is a Type 15?—A. Yes.

Q. Does a Type 15 feed water economiser contain welding clips? If you don't know, say so.—A. The only welding clips that are required on a Type 15 economiser are for welding the bends in position. There are no welding clips shown on the illustration on page 3.

Q. Would a Type 15 feed water economiser have connecter bends and boxes?—A. Yes, sir, it would.

Q. Would it have any tool kit clips?—A. Yes, sir, it would.

Q. Would it have end boxes and making-up boxes?—A. Yes, sir.

Q. And retaining rings?—A. Yes.

Q. Would it contain tubes supports?—A. Yes, sir.

Q. Plates?—A. Yes. [R. 30–31.]

It would appear, therefore, that as illustrated by plaintiff's exhibit 2, the components at bar may be used in the construction of a feed water economizer which contains no moving parts and which is not a machine in the tariff sense. While the testimony quoted above indicates that merchandise such as that imported is intended for use on so-called type 15 economizers, such economizers may or may not be part of a machine, depending upon the specific application of such articles. In other words, when items such as those at bar are used as part of a low-level economizer, they may constitute a part of a machine, but when used as part of a feed water economizer, such as illustrated in plaintiff's exhibit 2, which contains no valves, pumps, or other moving parts, the tubes, etc., are not parts of machines. However, in order to constitute these imported items as "parts" of a low-level economizer, it must be established that they are dedicated to use on such low-level economizers. The evidence in this case, in our opinion, is insufficient to establish that the items at bar are so dedicated. In fact, the testimonial and documentary evidence persuades us that the involved articles can be and are used in economizers which are not susceptible of classification as machines or as parts thereof.

In determining whether an article is a part of another for tariff purposes, this court has held that the material consideration is whether the item possesses distinguishing characteristics which dedicate or commit it to use as an essential constituent of the article for which it was intended. *Lodge Spark Plug Co.* v. *United States*, 49 Cust. Ct. 158, C.D. 2379. In the cited case, certain imported spark plugs, classified as parts of automobiles under paragraph 369(c) of the Tariff Act of 1930, as modified, were claimed properly dutiable under either paragraph 353 or paragraph 372 of said act, as modified, as parts of internal-combustion engines of the carburetor type. The defendant in C.D. 2379, *supra*, contended that "chief use" is the test for parts. However, the court in that case adhered to a prior holding that "chief use, even if established, is not sufficient for tariff purposes to constitute an article as part of another article" and held that dedication to use and not chief use was the test to be applied in determining whether an article constituted a part of another article. Accordingly,

the court therein held that spark plugs which were dedicated for use in internal-combustion engines, which engines were susceptible of use, as automotive, marine, industrial, and aviation motors, were "parts" of internal-combustion engines of the carburetor type within the provision of either paragraph 353 or paragraph 372 of the Tariff Act of 1930, as modified, as claimed. The court further held that, since the engines of which the spark plugs were parts, were not committed to use in automobiles or motorcycles, the spark plugs were improperly classified under paragraph 369 of the act, as parts of automobiles or motorcycles. See also *United States* v. *Fibre Making Processes, Inc.*, 33 CCPA 110, C.A.D. 323.

The defendant in its brief maintains that even conceding that the instant items are essential to the operation of a low-level economizer, this alone is insufficient, as a matter of law, to justify their classification under paragraph 372, and that it is proof of both essentiality and dedication which are the requisites to classification of a particular article as a part of something else for tariff purposes. In this connection, our attention is directed to the holding of the court in the case of *Gallagher & Ascher Company* v. *United States*, 52 CCPA 11, C.A.D. 849. It appears from the holdings in the *Lodge Spark Plug* and *Gallagher & Ascher* cases, *supra*, that, for tariff purposes, both essentiality and dedication to use are requisites to classification of a particular article as a part of something else. In our opinion, therefore, since the imported articles lack the requisite dedication to use with low-level economizers which appear to contain moving parts and which, in such case, would be considered machines for tariff purposes (*IDL Mfg. & Sales Corp.* case, *supra*), these articles are not classifiable as parts of machines under the provision of paragraph 372 of the tariff act, *supra*, and we so hold.

For the reasons heretofore stated, plaintiff, in the case at bar, has failed to establish that the imported articles are "parts" of a low-level economizer. The protests in this case are overruled:

Judgment will issue accordingly.